IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MATTHEW DUNN, *

   Plaintiff *

      v. * CIVIL NO. JKB 09-2851

EASTERN PETROLEUM, *

   Defendant *

\* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM**

Matthew Dunn brought this suit against Eastern Petroleum, seeking recovery of damages for alleged breach of contract, violation of the Maryland Wage Payment and Collection Law, and *quantum meruit*. Eastern Petroleum has moved for summary judgment, (Def.'s Mot. Summ. J., ECF No. 23) and Dunn has cross-moved for summary judgment (Pl.'s Mot. Part. Summ. J., ECF No. 26) as to his first cause of action, breach of contract, and has opposed summary judgment on his remaining claims. *Id*. The issues have been briefed and no oral argument is required. Local Rule 105.6. For reasons explained below, Matthew Dunn's Motion for Partial Summary Judgment is DENIED, and Eastern Petroleum's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

*I. Standard of Review*

A court may properly award summary judgment in federal cases when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(c)). The burden is on the moving party to demonstrate the absence of any genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a

reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine issue of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient to defeat a defendant's motion for summary judgment. *Id.* at 252. The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party, *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008), who may not rest upon the mere allegations or denials of his pleading but instead must, by affidavit or other evidentiary showing, set out specific facts showing a genuine issue for trial, Fed. R. Civ. P. 56(e)(2). Supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Rule 56(e)(1).

## *II. Background*

Matthew Dunn is an acquisitions consultant in the petroleum industry. In 2005, he was working with a long-term business partner, Jeffrey Dykstra, providing consulting services through Dykstra's company, Starnet. (Pl.'s Mem. Supp. Part. Summ. J. 3, ECF No. 26) In that year, Starnet contracted to provide services to Defendant, Eastern Petroleum ("Eastern"). Two years later, in May of 2007, the parties considered executing a written contract between Eastern and Starnet, but the agreement was later abandoned. *Id.* Instead, on June 17, 2007, Eastern entered an employment agreement directly with Jeffrey Dykstra, making him Director of Acquisitions. An identical "contract" bearing Dunn's name, entitled Executive Employment Agreement ("Executive Agreement") was drawn up and delivered to Dunn, but was never signed by either party. (Copy of Executive Agreement, Attach. 3 Ex. B, ECF No. 26) The draft contract provided for, among other things, a two year employment term, an annual salary of $165,000, and a minimum annual bonus of

2

$165,000.  *Id*.  It also provided that the contract would be terminated by Dunn's death, disability, or departure for "good reason."  *Id.*  Dunn contends that the failure to sign was mere oversight, and that he and Eastern's then president, John Rudolfs, agreed orally to the terms laid out in the draft contract.  (Pl.'s Mem. 3, ECF No. 26).

Dunn claims that he began work for Eastern in July of 2007, and continued until October 31, 2008.  (Pl.'s Mem. 4, 7, ECF No. 26)  During this period, he and Dykstra continued to hold themselves out in the market as Starnet, allegedly at Eastern's direction.  *Id* at 5.  Eastern sent payments to Dykstra, who would then distribute a portion to Dunn.  *Id* at 6.  Dunn alleges that this arrangement also was at Eastern's behest.  *Id*.  For a period, Dunn received monthly payments of $13,750, which is the amount that would have been due to him under the alleged contract.  *Id.*  On other occasions, Dunn received payments for twice this amount.  *Id*.  At some point, the payments stopped, and in November of 2008, after unsuccessfully requesting that Eastern honor the terms of the alleged contract, Dunn stopped work for Eastern.  *Id.*  In total, Dunn received $138,750 from Eastern for his services.  (Def.'s Mem Supp. Summ. J. 2, ECF No. 30).  He alleges that he is entitled under the contract to an additional $537,500.  (Compl. 6, ECF No. 1).

However, Eastern contends that it never had a contract with Dunn, and that the terms of any agreement they might have contemplated with him were still being negotiated as late as September 1, 2010, months after Dunn claims his employment contract went into effect.  (Def.'s Mem 3, ECF No. 30).  E-mails between Dunn and Dykstra from June and July of 2007 discuss the need to get their deal "finalized," (June 26, 2007 email exchange, Ex. 14, ECF No. 25) and to "…get on payroll now and… worry about the contract as we go."  (July 6, 2007 email, Ex. 22, ECF No. 25). Additionally, Eastern contends that Dunn never identified himself as its employee, but instead held himself out to third parties as a self-employed, independent contractor. (Def.'s Mem. Supp. Summ. J. 1-2, ECF No. 25)  For example, Dunn identifies himself as being self-employed on his tax filings

3

during the relevant years, and during the same time claimed to be "Managing Director of Starnet Capital" on his published resume. *Id*. Dunn also never received any tax reporting documentation or health benefits from Eastern, nor did he have a telephone extension, email address, or office at Eastern. *Id*. Finally, Eastern contends that the $138,750 it paid to Dunn represents full compensation for any work he performed. *Id* at 22.

## III. Analysis

### A. Breach of Contract

Plaintiff alleges that Defendant breached an oral employment contract. Therefore, the threshold inquiry is whether enforcement of the alleged contract is barred by the Statute of Frauds.

#### 1. Statute of Frauds

The Maryland Statute of Frauds bars the enforcement of oral contracts that cannot be fully performed within one year. MD. CODE ANN., CTS. & JUD. PROC. § 5-901(3) (West 2010). Since it is undisputed that the Executive Agreement was for an initial employment term of two years, it is covered by the Statute and so may not be enforced. *See Whitmore v. Hawkins*, 217 F.3d 843 (Table) (4th Cir. 2000).

Plaintiff presents three arguments as to why the alleged contract is not covered by the Statute of Frauds. None are availing. He first argues that because the Executive Agreement allows for termination of the parties' obligations in the event of Plaintiff's death, disability, or departure for "good reason," the contract could conceivably be performed within a year. (Pl.'s Mem. 4, ECF No. 26). But, Maryland courts have sided with a majority of jurisdictions in recognizing a distinction between performance and termination. *Collection & Investigation Bureau of Md. v. Linsley*, 375 A.2d 47, 51 (Md. Ct. Spec. App. 1977). Where contractual obligations are terminated by death, the contract is considered terminated, and not fully performed. *Id.* Therefore, the fact that Plaintiff's performance might have been excused by his death or disability within a year does not take the

4

contract out of the Statute of Frauds. *See id.*

While no Maryland case has extended the reasoning of *Linsley* to termination or departure for cause,[1] other authorities, on which the *Linsley* court relied, have. Williston, for instance, makes clear that the general rule is that an option to terminate a contract that is otherwise for more than a year, does not take it out of the Statute of Frauds. *Williston on Contracts* § 24:9 (4th ed.). The reason is that such termination prevents the full performance of the parties' promises to each other. This reasoning is also in line with language from *Corbin on Contracts*, cited by the *Linsley* Court.[2] Indeed, courts that have deviated from this application of the Statute have acknowledged that theirs is the minority rule. *See Frontier Insurance v. Hartford Fire Ins.*, 499 P.2d 1302, 1307 (1972). The Court finds that the majority rule is more in line with Maryland case law, and therefore holds that Plaintiff's option to leave his employment for "good reason" does not take the contract out of the Statute of Frauds.

### 2. Part-Performance

Next, Plaintiff claims that payments made to him by Defendant constitute substantial performance of the alleged employment contract, and that that performance makes the Statute of Frauds inapplicable. (Pl.'s Mem. 13-14, ECF No. 26). Under Maryland law, evidence of part-performance of an oral contract, otherwise barred by the Statute of Frauds, will allow the plaintiff to

---

[1] Maryland cases have held that contracts that are terminable at will are not barred by the one year provision of the Statute of Frauds. *Griffith v. One Inv. Plaza Associates*, 488 A.2d 182, 185 (Md. Ct. Spec. App. 1985)(citing *Home News, Inc. v. Goodman,* 35 A.2d 442 (1944))**.** However, the Executive Agreement clearly defines "good reason" as: "(i) the failure of the Employer to pay any amounts due under this Agreement…, (ii) a substantial diminution in the material status, title, position or responsibilities of the Executive…, (iii) the requirement that the Executive engage in any unlawful act or act of dishonesty, fraud, or deception in the course of his employment." (Executive Agreement 3-4, Attach. 3 Ex. B, ECF No. 26). Because of the term's specificity, the Agreement clearly cannot be construed to be at will. While the parties do not raise the issue, it also bears noting that the Agreement's provision for the Executive's termination "for cause" is similarly narrowly defined. *Id* at 3.

seek a remedy on condition that: (1) the facts present a case for equitable relief; and, (2) the part-performance is specifically referable to the oral contract. *Unitas v. Temple*, 552 A.2d 1285, 1290-1291 (Md.1989).

As to the first condition, "It is well-settled that the doctrine of part performance is an equitable principal, available only when the relief sought is equitable in nature" *Collins v. Morris*, 716 A.2d 384 (Md. Ct. Spec. App. 1998). Plaintiff attempts to characterize his claim as one for specific performance of Defendant's contractual duty to pay him. (Pl.'s Mem. Supp. Part. Summ. J. 3, ECF No. 29). But, there is a legal remedy available here. The award of an amount of money that a party expected to receive under a contract is well known as the measure of expectation damages, which is the standard measure of recovery for breach of contract. *Williston on Contracts* §§ 64:1-2. Even if Plaintiff were truly seeking equitable relief, he would not be entitled to it, since a court will only grant such relief when a legal remedy is unavailable or inadequate. *Cattail Associates v. Sass*, 907 A.2d 828 (Md. Ct. Spec. App. 2006). Since Plaintiff's claim for money is identical to a claim for expectation damages, he can hardly argue that a legal remedy is unavailable or inadequate. Therefore, Plaintiff does not present a case for equitable relief.

As to the second part of the test, the part-performance must be unequivocal evidence of the *specific* contract plaintiff seeks to enforce, and not merely evidence that *some* contract existed between the parties. *Beall v. Beall*, 434 A.2d 1015, 1019 (981)(quoting *Semmes v. Worthington,* 38 Md. 298, 326-27 (1873)). Even viewed in the light most favorable to him, Plaintiff's allegations clearly fail this test. The only facts Plaintiff cites in evidence of part-performance are e-mails he sent in the course of his consulting work, and a series of monthly payments from Defendant in an amount he claims is the same as would be due to him under the terms of the Executive Agreement.

---

[2] The *Linsley* court adopted the test articulated by Corbin: "If the promisor should die within a year, would the promised performance be wholly completed in accordance with the terms of the agreement, or would the legal duty of the promisor

(ECF No. 26b at 14). While all this may well be evidence that he had *some* agreement with Defendant, none of it strictly evinces the terms of the Executive Agreement. The fact that the payments Plaintiff received corresponded to his annual salary under the Agreement does not strike the Court as unusual. If a salary of $165,000 a year was a reasonable price for Plaintiff's services, it should not be surprising if that number turns up in other contracts for those same services.

Since Plaintiff cannot seek an equitable remedy, and since the part-performance he alleges is not specifically referable to the Executive Agreement, the Agreement remains subject to application of the Statute of Frauds.

### *3. Party Admission*

Finally, Plaintiff argues that the contract is taken out of the Statute of Frauds because, he contends, Defendant's former president, John Rudolfs, admitted to its existence in his deposition testimony. (Pl.'s Mem. 5-6, ECF No. 29). "The Statute of Frauds is satisfied 'by admissions in the form of sworn testimony in court or on deposition, or in an answer to a complaint.'" *Barranco v. Barranco*, 604 A.2d 931, 934 (Md. Ct. Spec. App. 1992) (citing *Litzenberg v. Litzenberg,* 307 Md. 408, 415, 514 A.2d 476 (1986)). The admission must be made either by the party against whom the contract is being enforced, or by that party's agent. *See id.* The testimony cited by Plaintiff, however, does not constitute such an admission. Plaintiff cites the following exchange from the deposition of John Rudolfs:

Q. Okay. Do you recognize Plaintiff's 2? [i.e., the unsigned Executive Agreement]

A. Yes.

Q. Do you recognize it as an executive employment agreement that was to exist between Mr. Dunn and Eastern Petroleum?

---

be terminated and the promised performance at the same time remain uncompleted?" 375 A.2d at 50, 51.

> A. Yeah, that's what it is. Yes, that's correct.
>
> Q. Okay. Now, it's not, unlike Plaintiff's Exhibit 1, Plaintiff's Exhibit 2 is not executed. Did you see that? There's no signature at the end of Plaintiff's Exhibit 2?
>
> A. That's correct.
>
> Q. Do you have any understanding as to why Plaintiff's Exhibit 2 is not executed?
>
> A. I don't remember.

Rudolfs subsequently testified that he was aware that Defendant made payments to Plaintiff for his consulting services. He also testified that:

> Q. Okay. And do you recall testifying that that money was paid to Mr. Dunn in connection with a consulting agreement that Eastern Petroleum had with Mr. Dunn? Do you recall that testimony as well?
>
> A. No. I mean, there was an agreement, yes, there was, yes.

(Rudolfs' Dep., Attach. 2 Ex. B, ECF No. 26).

Like Plaintiff's proffered evidence of part-performance, these statements at most confirm the existence of *some* agreement. Mr. Rudolfs' statement that he recognized the Executive Agreement as an agreement that *was to exist* between the parties in no way establishes that that Agreement was ever consummated. Indeed, his statement that he did not remember why the Agreement was never executed shows definitively that he lacked the necessary knowledge to make any such admission. It is well to note here that the "wisdom of the Statute of Frauds" lies in part in ensuring that a litigant's fortune does not depend "upon the chances, the uncertainty and imperfections of human memory…" *Semmes v. Worthington,* 38 Md. At 319. Thus, to suspend the Statute of Frauds on account of a witness' *lack* of memory, as Plaintiff asks this Court to do, would be wholly anomalous.[3]

---

[3] Furthermore, even if Rudolfs had unambiguously testified that the Executive Agreement accurately reflected the terms of an oral contract between Plaintiff and Defendant, this still would not take the agreement out of the Statute of Frauds

For these reasons, the Court finds that Defendant has adequately shown that no genuine dispute as to any material fact exists regarding the alleged oral contract, and that Defendant is entitled to summary judgment on all claims relating to the attempted enforcement of any such contract.

### B. Maryland Wage Payment and Collection Law

Plaintiff alleges that he was an employee of Defendant and that by failing to fully compensate him for the work he performed, Defendant violated the Maryland Wage Payment Collection Law. (Compl. 6-7, ECF No. 1). An employee need not have had a written contract with his employer to recover under the Act; therefore, the fact that Plaintiff's alleged employment contract is barred by the Statute of Frauds does not automatically defeat his claim under the Wage Act. Rather, the threshold inquiry under the Act is whether Plaintiff is an "employee" covered by its terms. Therefore, as the moving party, Defendant has the burden of establishing the absence of any factual dispute regarding Plaintiff's status as an employee.

The Act does not define the term "employee" but in *Baltimore Harbor Charters v. Ayd*, the Maryland Court of Appeals, following the U.S. Supreme Court, adopted the common law distinction between a servant and an independent contractor as the applicable standard. *Baltimore Harbor Charters v. Ayd*, 780 A.2d 303, 318 (2001). The Court identified six factors that indicate servant/employee status:

> 1. Whether the employer actually exercised or had the right to exercise control over the performance of the individual's work; 2. Whether the individual's service is either [sic] outside all the usual course of business of the enterprise for which such service is performed; 3. Whether the individual is customarily engaged in an independently established trade, occupation, profession, or business; 4. Whether it is the employer or the employee who supplies the instrumentalities, tools, and location for the work to be performed; 5. Whether the individual receives wages directly from the employer or from a third party for work performed on the employer's behalf; and 6.

---

because Rudolfs was not employed by Defendant at the time of his deposition and is therefore neither a party nor a party's agent. *See Barranco v. Barranco*, 604 A.2d at 934.

> Whether the individual held an ownership interest in the business such that the individual had the ability and discretion to affect the general policies and procedures of the business." *Id.*

Defendant cites numerous materials in the record demonstrating the absence of the common law indicia of servant status. (Def.'s Mem Supp. Summ. J. 14-16, ECF No. 25). As to the first of the six factors, Plaintiff appears to have performed his services for Defendant by holding himself out in the market as a representative of Starnet, independent of Defendant's business. As such, he identified potential acquisitions and then presented them to Defendant for its consideration. *Id* at 14-15. Furthermore, e-mails from Plaintiff indicate that he was working on behalf of other clients during the period of his alleged employment. *Id.* These facts undermine any claim that Defendant controlled the manner in which Plaintiff did his work. Second, Defendant points out that its primary business is the distribution of petroleum, whereas Plaintiff's services related to financing acquisitions. *Id.* While it is not entirely clear that acquisitions are outside Defendant's usual course of business, it is clear from the facts cited above that Plaintiff was engaged in an independently established business. Indeed, plaintiff repeatedly describes his services to Defendant as "consulting" services, which connotes an independent actor. (Pl.'s Mem *passim*, ECF No. 29). As to the fourth factor, Plaintiff states that he never received any tools or instrumentalities from Defendant and that he worked from his home in Massachusetts. (Def.'s Mem 16, ECF No. 25). Fifth, Plaintiff also states that he was never paid directly by Defendant, but instead received payments through his business partner, Jeff Dykstra. *Id.*

Having adequately established the lack of any controversy as to these facts, the burden shifts to the Plaintiff to establish some other factual dispute that would affect the determination of his status as an employee. *See Matsushita Elec. Indus. v. Zenith Radio,* 475 U.S. 574, 586-88, (1986). Plaintiff fails to address any of Defendant's assertions as to factors two through five. (Pl.'s Mem, ECF Nos. 26, 29) The Court therefore considers Defendant's assertion of facts as to those issues to

be undisputed. Fed. R. Civ. P. 56(e)(2). Plaintiff does maintain that there is a dispute as to his independence from Eastern because he "testified that he reported to EP's president and further testified that he was obligated to follow the work directions of Mr. Rudolfs." (Pl.'s Mem. 7, ECF No. 29). However, Plaintiff cites no facts in the record to support this allegation. A party opposing a motion for summary judgment must support its assertions with specific facts, cited in the record, showing that there is a genuine issue of fact. Fed. R. Civ. P. 56(c). Unsupported conclusions, such as Plaintiff's assertion that Rudolf's controlled his work, will not defeat a properly supported motion for summary judgment. *See Francis v. Booz, Allen & Hamilton,* 452 F.3d 299, 308 (4th Cir. 2006).

Therefore, the Court finds that Defendant has carried its burden of demonstrating the lack of any dispute as to a material fact regarding Plaintiff's Wage Payment and Collection Law claim, and is therefore entitled to summary judgment on that issue.[4]

### C. *Quantum Meruit*

Plaintiff claims that even if his alleged contract with Defendant is unenforceable, he is still entitled to compensation for work he actually performed. (Pl.'s Mem. 15, ECF No. 26). As the moving party, Defendant has the burden of showing that no genuine dispute exists as to what work plaintiff did, how much compensation he was entitled to, and how much Defendant actually paid.

As Maryland courts have explained, *Quantum Meruit* encompasses two distinct actions: one based on a contract implied in fact, the other based on a contract implied in law. *Mogavero v. Silverstein*, 790 A.2d 43, 52 (Md. Ct. Spec. App. 2002). An implied in fact contract is an actual contract, reflecting mutual assent, that while not expressed in words is evident from the parties'

---

[4] The Court further notes that even if Plaintiff had shown that he was an employee of Defendant, he would not have been entitled to treble damages under the Act. Treble damages are available only when the fact-finder determines that a defendant's failure to pay wages was *not* the result of a *bona fide* dispute. Because of the lack of evidence as to the terms of plaintiff's employment, if indeed he was employed, the Court finds that no reasonable jury could fail to conclude that a *bona fide* dispute exists between the parties. Therefore, even if Plaintiff were allowed to proceed under the Act, his only recovery would be for services rendered; the claim, then, would merge with his *quantum meruit* claim, discussed below.

conduct. *Id.* The implied in law contract, on the other hand, is not a contract at all, but an obligation imposed by law to pay for goods or services received. *Id.* The key differences between the two actions are the modes of proof and the remedies available. For a contract in fact, the plaintiff must show that he rendered services under circumstances indicating that: (1) he expected to be paid; (2) Defendant expected or should have expected to pay; and (3) there was a meeting of the minds.[5] *See id.* For a contract implied in law, or "quasi-contract," the plaintiff need only show: (1) that he conferred a benefit on the defendant; (2) knowledge of that benefit by defendant; and (3) acceptance by the defendant and circumstances that make the acceptance unjust unless paid for. *County Com'rs of Caroline County v. J. Roland Dashiell & Sons,* 747 A.2d 600, 607 (2000). The remedy is restitution of the benefit conferred. *Mogavero v. Silverstein***,** 790 A.2d at 52. Maryland courts also allow plaintiffs to recover under a contract implied in fact theory when an express contract is unenforceable because of the Statute of Frauds. *Id* at 55.

Defendant asserts that no contract whatever existed between it and Plaintiff because there was no mutual assent as to terms.[6] (Def.'s Mem. 12, ECF No. 25). To support this position, it points to e-mails between Plaintiff and Jeff Dykstra discussing the need to get their deal with Defendant "finalized" and to "get on payroll and… worry about the contract as we go." *Id*. Defendant further alleges that there is no evidence to support Plaintiff's claim that he performed services for which Defendant should have expected to pay between March and October of 2008. (Def.'s Mem. 15, ECF No. 30). Plaintiff's evidence on this point consists of five e-mails, which

---

[5] In *Mogavero*, the Maryland Court of Special Appeals noted that as of 2002 no Maryland case had expressly set forth the elements of a *prima facie* contract implied in fact. Although it did not expressly say so, it appeared to adopt the first two elements cited here, which it took from Washington State case law. The third element, meeting of the minds, is added here because the *Mogavero* court includes it in the test in a subsequent part of the opinion. Additionally, Maryland case law is very clear that a contract implied in fact must meet all the same conditions as an express contract, which clearly includes a meeting of the minds.

[6] This argument does not appear in the *quantum meruit* section of Defendants memorandum. However, it is clearly germane in view of the requirement of mutual assent for an implied contract.

Defendant claims is insufficient to support his claim for compensation. *Id.* Two of these e-mails, Defendant admits, show Plaintiff consulting with Defendant regarding potential deals. *Id.* Defendant further attacks the sufficiency of Plaintiff's evidence regarding the valuation services he rendered on particular deals. The only evidence on this point is Plaintiff's statement in an answer to interrogatories, that he rendered services on three deals: Harper Petroleum, Little General, and T-Court. (Pl.'s Answer Def.'s 2nd Interrog. Ex. 25, ECF No. 25). Plaintiff estimated the market value of his services on these deals at $400,000, $600,000, and $165,000, respectively. *Id.* Then, in his deposition testimony, Plaintiff states that he based his valuations for the Harbor Petroleum and Little General deals on their value if the deals had gone through, which he admits they did not. (Dunn Dep. 251, Ex. 2, ECF No. 25). Regarding the T-Court deal, Plaintiff stated that his valuation was based on his observation of fees for similar services in the market. *Id* at 252-253. He then stated that both he and Mr. Dykstra worked on T-Court together, and that his estimate of $165,000 would have been a reasonable fee for both of their services together. *Id.*

Defendant argues that because the valuations of the first two deals were based on their going through, which did not take place, Plaintiff is owed nothing for them. (Def.'s Mem 16, ECF No. 30). As to T-Court, Defendant argues that since Plaintiff agrees that $165,000 was a reasonable fee for both his and Dykstra's services, that he is only entitled to half. That amount, $53,250, is less than what Plaintiff alleges he already received from Defendant. (Def.'s Mem. 22, ECF No. 25).

While Plaintiff's evidence on these points is less than overwhelming, the Court finds that there are sufficient factual disputes to make the issue inappropriate for summary judgment. First, there is clearly a dispute as to the existence of an actual agreement between the parties. Defendant steadfastly denies any such agreement, yet its former president has testified that *some* agreement did exist. Furthermore, Plaintiff has shown that he performed services for Defendant for which he was compensated, which is at the very least circumstantial evidence of a course of dealing suggesting a

contractual relationship. As to Plaintiff's valuation of his services, it is unclear what method he used to calculate the values for Harbor Petroleum and Little General, or what is their fair market value given that the deals did not go through. Nevertheless, viewed in the light most favorable to him, his sworn assertion that the services have *some* value regardless of the deals' outcomes at the very least creates a factual dispute in view of Defendant's contention that the Plaintiff is owed nothing. Similarly, even Plaintiff's five e-mails could conceivably be found by a reasonable jury to indicate that Plaintiff did *something* for Defendant, and that the initial pattern of monthly payments represented the compensation Plaintiff might have legitimately expected.

Therefore, the Court finds that there is enough of a factual dispute regarding what services Plaintiff performed for defendant and the fair market value thereof to proceed to trial. The Court therefore denies summary judgment as to Plaintiff's *quantum meruit* claim.

## *IV. Conclusion*

The Court concludes that no genuine issues of material fact exist as to Plaintiff's claims for breach of contract and under the Maryland Wage Payment and Collection Law, but that such issues do exist as to Plaintiff's claim for *quantum meruit*. Accordingly, Defendant's Motion for Summary

Judgment is GRANTED IN PART and DENIED IN PART, and Plaintiff's Motion for Partial Summary Judgment is DENIED.


Dated: January 26, 2011              /s/
                                                James K. Bredar
                                                United States District Judge